UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WHITE PEARL HOSPITALITY LLC d/b/a Hyatt
Centric Wall Street New York,

                    Plaintiff,

        v.

HOTEL & GAMING TRADES COUNCIL, AFL-
CIO a/k/a New York Hotel & Motel Trades
Council, AFL-CIO,

                    Defendant.

No. 24-cv-3022 (RA)

<u>AMENDED
OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

Plaintiff White Pearl Hospitality LLC brings this labor contract action against the Hotel &

Gaming Trades Council, AFL-CIO (the "Union"), seeking a declaratory judgment that it is not

bound by two labor contracts as well as requesting an injunction ordering the Union to cease

attempts to enforce those agreements. Soon after suit was filed, an arbitrator issued two arbitration

awards finding that both labor contracts were valid and in force and ordering White Pearl to comply

with their terms. The Union then filed a motion to dismiss the complaint along with a motion to

confirm the awards, to which White Pearl responded by filing a cross-motion to vacate them. For

the reasons that follow, the Court agrees with the Union that White Pearl has not met the high

standard for vacating an arbitral award, and on that basis grants the Union's motion to confirm

both awards, denies White Pearl's cross-motion to vacate them and grants the Union's motion to

dismiss the complaint.

## BACKGROUND

The following facts are drawn from the pleadings, attached materials and various

submissions by the parties. *See Coscarelli v. ESquared Hosp. LLC*, No. 18-cv-5943 (JMF), 2021

WL 5507034, at *1 (S.D.N.Y. Nov. 24, 2021).  In 2012, the Hotel Association of New York City entered into a collective bargaining agreement with the Union, a labor organization representing various hotel employees in New York and New Jersey.  Dkt. No. 19 ("Compl.") ¶¶ 2, 6.  This agreement, known as the Industry Wide Collective Bargaining Agreement (the "IWA") took effect in July 2012, and was later extended through June 2026.  *Id.* ¶¶ 6, 8; *see also id.* Ex. 1 ("IWA") at 11.  It includes various provisions regulating the terms of employment at hotels within the area, including wages, benefits and terminations.  IWA art. 60(B)(2).  Like many collective bargaining agreements, the IWA also provided that any disputes would be subject to arbitration, specifically before an arbitrator entitled the "Impartial Chairperson" (the "IC").  *Id.* art. 26(A).[1]  Of particular relevance here, the IWA also included a provision—Article 53—directed to "Technological Change," which required hotel employers to meet with the Union before they implemented any technological improvements in order to discuss whether such changes would lead to layoffs and, if so, whether severance would be provided.  *Id.* art. 53.  The IWA also included a successor clause, which provided that any "successor" to one of its parties "shall assume all obligations of the predecessor . . . , including this Agreement and those agreements and practices supplementing this Agreement."  *Id.* art. 59(C).

At the time the IWA took effect in 2012, the hotel now owned by White Pearl was under different ownership, and known as the Andaz Hotel.  Compl. ¶ 6.  Over the years that followed, the Union and the Andaz Hotel entered into two additional agreements after the hotel sought to

---

[1] The arbitration clause provided, in relevant part, that "[a]ll complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be final and binding upon the parties hereto.  Any questions regarding arbitrability, substantive, procedural, or otherwise, or regarding the Impartial Chairperson's jurisdiction or authority, shall be submitted to the Impartial Chairperson in accordance with this Article."  IWA art. 26(A).

implement new technological changes to its facilities. *Id.* ¶ 9. In 2013, the two reached an agreement (the "2013 Agreement") that permitted the Andaz Hotel to implement an automatic answering system in its phone system. *Id.* Under the terms of that Agreement, the parties agreed that the Andaz Hotel could use its "auto-answer feature on a full time basis for all external incoming telephone calls," although all "internal calls" and those routed through the "switch" would be answered by a "live" guest services host. Dkt. No. 19 Ex. 3 ("2013 Agreement") ¶ 1. The Andaz Hotel also agreed to pay about $14,000 to several guest services hosts in satisfaction of "any and all claims" they had over its implementation of the auto-answering system. *Id.* ¶ 2. The Agreement expressly acknowledged that both parties were also parties to the IWA, and provided that any disputes regarding its terms would be subject to the same arbitration procedures set forth in the IWA. *Id.* ¶ 4.

Several years later, in 2019, the parties entered into another agreement (the "2019 Agreement") after the Andaz Hotel sought to implement a keyless entry system for guests. Compl. ¶ 10; Dkt. No. 19 Ex. 4 ("2019 Agreement"). Like the 2013 Agreement, the 2019 Agreement also acknowledged that both parties were subject to the IWA, and required that any disputes arising from it be subjected to the IWA arbitration protocol. 2019 Agreement ¶ 8. According to its terms, this new Agreement permitted the Andaz Hotel to implement the keyless entry system, provided that it would not cause any employees to be laid off or to have their hours reduced. *Id.* ¶¶ 1–2. It also included a penultimate paragraph—Paragraph 7—that purported to limit the Andaz Hotel's ability to rely on IWA Article 53 to implement additional technological changes to its facilities. *See id.* ¶ 7 ("The Hotel may not rely on Article 53(D) of the IWA to implement any changes which would result in any bargaining unit employee being laid off, placed on a reduced work week, or otherwise adversely affected, nor which would result in a reduction in the number of bargaining

unit positions without the consent of the Union.  The final sentence of Article 53(D) of the IWA shall not apply to the Hotel.").

Two years later, in December 2021, Plaintiff White Pearl purchased the Andaz Hotel and renamed it the Hyatt Centric Wall Street Hotel.  Compl. ¶ 11.  White Pearl subsequently entered into an agreement to assume all of Andaz Hotel's obligations under the IWA and all agreements supplementing it.  *Id.*  Then, in February 2024, White Pearl notified the Union that it planned to implement a new telephone system called a "private branch exchange" ("PBX") at the hotel.  *Id.* ¶ 12.  The Union wrote back that it would be "improper and unlawful to unilaterally implement this New Technology absent agreement with the Union," and asked for more information about the planned system.  *Id.* ¶ 13.

Although the parties met twice to discuss White Pearl's plans, they were unable to reach an agreement.  *Id.* ¶¶ 14–15.  At the second meeting, on March 11, 2024, the Union produced copies of the 2013 and 2019 Agreements and told White Pearl that it was prohibited from implementing the PBX system without the Union's consent.  *Id.* ¶ 15.  About a week later, White Pearl emailed the Union and stated it was ready to resume bargaining, but received no response. *Id.* ¶ 16.

The next month, on April 5, 2024, White Pearl sent a letter to the Union stating that it had decided to "exercise its discretion" and "terminate" the 2013 and 2019 Agreements.  *Id.* ¶ 17.  In the letter, White Pearl took the position that both Agreements were terminable at will, since neither specified an end date.  *Id.*  ("[T]he 2013 Agreement and the 2019 Agreement by design are terminable consistent with applicable law as the parties agreed to terms of indefinite duration and

are not incorporated into any other collective bargaining agreement by their terms."). White Pearl made several other entreaties to resume bargaining but was unsuccessful. *Id.* ¶¶ 18–23.[2]

The Union then contacted the Office of the IC and requested an emergency hearing on White Pearl's alleged violations of the 2013 and 2019 Agreements. *Id.* ¶ 25. The day before the hearing was scheduled, White Pearl filed this action, seeking a declaration that the Agreements were both invalid, as well as an injunction barring the Union from enforcing them. *See* Dkt. No. 1 ¶¶ 25–42. The IC then held the hearing on April 22, 2024, where White Pearl advanced the argument that it had previously floated, asserting that the 2013 and 2019 Agreements were terminatable "at will" because neither had an expiration date. Compl. ¶ 25. The IC rejected those arguments and issued an award on May 2, 2024 (the "May 2024 Award") holding that both Agreements are still in effect. *Id.* ¶¶ 25–26; *see also* Dkt. No. 19 Ex. 6 ("May 2024 Award").

At around the same time, White Pearl allegedly began requiring all of its customer service hosts who answer internal and switchboard calls to maintain daily call logs. Compl. ¶ 28. Although the hosts initially complied, they eventually stopped maintaining the logs, purportedly on instructions from the Union. *Id.* White Pearl then began laying off some of these employees, citing "redundancy and overstaffing." *Id.* ¶ 29. White Pearl maintains that these layoffs were "unrelated to the PBX system," which it insists "has not [been] implemented." *Id.* ¶ 30.

Soon after the layoffs, the Union requested another emergency hearing with the IC, alleging that White Pearl had violated the 2013 and 2019 Agreements by terminating the employees. *Id.* ¶ 32. The IC then held another hearing and again issued an award (the "July 2024 Award") in favor of the Union. *Id.* ¶ 33; Dkt. No. 19 Ex. 7 ("July 2024 Award"). This Award likewise rejected

---

[2] According to the Complaint, White Pearl also filed an unfair labor practice charge against the Union with the National Labor Relations Board, asserting that it had refused to bargain in good faith. Compl. ¶ 24. The record does not indicate the status of those proceedings.

White Pearl's arguments that the Agreements had been terminated, as well as its contention that the Union had acted in bad faith by refusing to renegotiate those Agreements to allow the new PBX system.  Compl. ¶ 33.  The IC further ordered White Pearl to immediately reinstate the employees and pay them back pay, plus penalties.  *Id.* ¶ 34.

After both of the Awards were issued, White Pearl amended its complaint in this action, including new allegations about the Awards and adding a new cause of action seeking to vacate both of them.  *Id.* ¶ 54–61.  The Union responded by filing a motion to confirm both awards, as well as a motion to dismiss the Complaint.  Dkt. No. 24.  White Pearl opposed those motions and filed a cross-motion to vacate the Awards.  Dkt. No. 29.

## LEGAL STANDARD

"Section 301 of the Labor Management Relations Act (LMRA) provides federal courts with jurisdiction over petitions brought to confirm labor arbitration awards."  *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 88 (2d Cir. 1998). "[A] federal court's review of labor arbitration awards is narrowly circumscribed and highly deferential—indeed, among the most deferential in law."  *Nat'l Football Leage Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 532 (2d Cir. 2016).  "Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected."  *Mason Tenders Dist. Council of Greater N.Y. & Long Island v. Air Constr. Corp.*, No. 20-cv-9299 (VEC), 2021 WL 363972, at *2 (S.D.N.Y. Feb. 3, 2021) (alterations omitted) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)). In deciding whether to vacate, "[a] court is not authorized to review the arbitrator's decision on the merits; its role is simply to determine whether the arbitrator acted within the scope of his

authority as defined by the collective bargaining agreement." *N.Y.C. & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am. v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc.*, 826 F.3d 611, 618 (2d Cir. 2016) (internal quotation marks omitted). "[A]s long as the arbitrator was even arguably construing or applying the contract and acting within the scope of his authority and did not ignore the plain language of the contract, the award should ordinarily be confirmed." *Id.* (internal quotation marks omitted). Although the Federal Arbitration Act ("FAA") does not apply to "arbitrations in the labor context," the Second Circuit has "substantially imported the analysis of the FAA" when reviewing labor arbitral awards governed by the LMRA. *A&A Maint. Enter., Inc. v. Ramnarain*, 982 F.3d 864, 869 n.2 (2d Cir. 2020).[3]

## DISCUSSION

Before the Court are several motions: a motion to dismiss the complaint, a motion to confirm the Awards and a cross-motion to vacate the Awards. Because the Court must confirm the Awards if they are not vacated, it starts with White Pearl's cross-motion to vacate.

I.    **Cross-Motion to Vacate the Arbitral Awards**

In its cross-motion, White Pearl argues that both Awards must be vacated because they were issued in "manifest disregard" of the law. Dkt. No. 30 ("White Pearl Opp'n") at 8. It first takes aim at the May 2024 Award, asserting that the IC erred in concluding that the 2013 and 2019 Agreements remained in force and were not terminable at will. *See id.* As for the July 2024 Award, White Pearl disputes the IC's conclusion that the Agreements excused the Union from bargaining over technological challenges under Article 53 of the IWA. *See id.* at 10. Neither challenge is persuasive.

---

[3] On September 5, 2025, the Court issued an opinion citing the FAA on several points of law. *See* Dkt. No. 43. It issues this amended opinion to clarify that, although the LMRA applies to this dispute, the Court reaches the same result through the same analysis.

A.      **May 2024 Award**

In challenging the May 2024 Award, White Pearl does not dispute that the underlying dispute was arbitrable.  Nor could it, given the expansive language in the IWA and both Agreements mandating that such disputes be submitted to arbitration before the IC.  *See* IWA art. 26(A); 2013 Agreement ¶ 4; 2019 Agreement ¶ 8.  Its challenge instead boils down to an issue of contract interpretation:  whether the 2013 and 2019 Agreements were terminable at will.  At the hearing before the IC, White Pearl asserted that it had the unilateral right to terminate both Agreements—and eliminate the restrictions on technological changes imposed in Paragraph 7 of the latter—because both contracts were of indefinite duration.  Compl. ¶ 25; May 2024 Award at 1–2; *see also Compania Embotelladora del Pacifico S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 245 (2d Cir. 2020) ("Under New York law, it is well settled that a contract of indefinite duration is terminable at will unless the contract states expressly and unequivocally that the parties intend to be perpetually bound.").  The IC rejected those arguments and found that both Agreements had incorporated the same expiration date as the IWA, June 30, 2026.  *See* May 2024 Award at 2. Because that conclusion defeated White Pearl's "indefinite term" position, the IC rejected its arguments and issued the May 2024 Award holding that the 2013 and 2019 Agreements remained in effect.  *Id.* at 3.

White Pearl now argues that the IC reached this conclusion in manifest disregard of the law, and that the May 2024 Award should thus be vacated.  In its view, the IC was not interpreting the Agreements so much as "act[ing] like a legislator" by "creating" new contract terms out of whole cloth and inserting them into the Agreements.  White Pearl Opp'n at 8, 10.  And because the IC was not truly construing the contract, White Pearl continues, the Award itself must be set aside.

8

That argument is rejected.  When courts review awards under the LMRA, they "accord nearly total deference to arbitral decisions."  *Local 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999).  Arbitrators have particular leeway when it comes to construing the terms of a contract, as courts "generally refuse[] to second guess an arbitrator's resolution of a contract dispute."  *John T. Brady & Co. v. Form-Eze Sys., Inc.*, 623 F.2d 261, 264 (2d Cir. 1980).  Indeed, contractual interpretation is firmly "within the province of the arbitrator and will not be overruled simply because [the Court] disagree[s] with that interpretation."  *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997).  For that reason, courts must enforce any award in which "the arbitrator is even arguably construing or applying the contract," *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987), and will do so as long as the arbitrator has provided "a barely colorable justification for the outcome reached," *Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29, 31 (2d Cir. 1997) (internal quotation marks omitted).

The IC's Award clears that bar and thus cannot be overruled.  Under New York law, a contract may supply an end date by implication even if its express terms do not mention one.  *See Creative Foods Corp. v. Chef Francisco, Inc.*, 458 N.Y.S.2d 917, 917–18 (1st Dep't 1983).  Here, the IC applied that principle to the 2013 and 2019 Agreements and found that both implicitly adopted the expiration date of the IWA—the "overarching agreement" to which both Agreements were tied.  May 2024 Award at 2.  That interpretation of the Agreements is a plausible one, and is certainly supported by more than a "barely colorable justification."  *Wackenhut Corp.*, 126 F.3d at 31 (internal quotation marks omitted).  After all, both Agreements refer explicitly to the IWA, and purport to modify the parties' obligations under it, which suggests that they share the same term as the IWA.  *See* 2013 Agreement ¶ 1 (agreeing to allow White Pearl to implement technological

change governed by IWA Article 53); 2019 Agreement ¶ 1 (same for another technological change). Indeed, the 2019 Agreement imposed clear restrictions on White Pearl's rights under the IWA going forward, and it would make little sense for those restrictions to continue *after* the IWA expires, since White Pearl would not have any surviving rights to limit. *See* 2019 Agreement ¶ 7 (barring White Pearl from unilaterally implementing technological changes under Article 53(D) of the IWA). The IC's conclusion that the 2013 and 2019 Agreements take the IWA's expiration date is thus reasonable, and therefore the Court need not determine whether it was ultimately correct. *See Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 25 (court may not overrule arbitrator "simply" because it "disagree[s]" with contract interpretation).

White Pearl's arguments that the arbitrator "create[d] new obligations" out of thin air are unpersuasive. White Pearl Opp'n at 8. It primarily relies on *Harry Hoffman Printing, Inc. v. Graphic Communications International Union, Local 261*, a case where the Second Circuit vacated an arbitration award that tried to insert "entirely new terms" into a contract that the parties had not bargained for. 950 F.2d 95, 100 (2d Cir. 1991). But unlike here, that arbitrator *did* fabricate new terms and inject them into the parties' agreement. The dispute there arose when several members of a lithographers' union honored the picket lines of a bookbinders' strike and refused to report to work. *See id.* at 96–97. The employers fired the striking lithographers and hired permanent replacements without giving them notice, which prompted the union to commence arbitration against the employers for hiring permanent replacements without notice. *See id.* at 97. Although the CBA did not include any terms requiring such notice be given, the arbitration panel concluded that the CBA should have included provisions to that effect, since giving notice would align with the idea of "due process" reflected in other terms of the CBA. *Id.* at 97 (quoting arbitration award). The Circuit rejected that attempt to insert new terms into the CBA, however,

10

and vacated the award.  As it explained, the arbitration panel had reached its conclusion not by construing the contract but by acting on their "subjective notions of a fair labor contract"—that is, by deciding that a fair CBA would require employers to give notice before hiring permanent replacements.  *Id.* at 100 (criticizing the award for relying "explicitly and exclusively on non-contractual concepts" and "effectively impos[ing] a condition not bargained for by the parties").

That is a far cry from what the IC did here.  He did not conclude that the 2013 and 2019 Agreements share the same end date as the IWA because it was fair or just, or otherwise rely on "non-contractual concepts" to reach his decision.  *Id.*  He instead inferred the termination date of both Agreements from their actual terms, in an exercise of contractual interpretation.  Indeed, that is precisely what *Harry Hoffman* authorized arbitrators to do:  "imply terms or fill gaps in an agreement" when construing its scope and content.  *Id.*  Because the IC stayed well within those limits here, *Harry Hoffman* provides no basis to vacate his award.

White Pearl also points to the 2015 Memorandum of Understanding ("MOU") that extended the IWA's expiration date, but that too leads nowhere.  *See* White Pearl Opp'n at 9.  According to White Pearl, the MOU did not reference any side agreements, which means that it did not extend the expiration date of existing agreements like the 2013 Agreement.  That is a red herring.  The question here is not whether the MOU extended the duration of the 2013 Agreement, but whether the 2013 Agreement itself implicitly set an expiration date that aligned with the IWA.  The IC answered that question affirmatively, which as already discussed was justifiable and cannot be "second guess[ed]" by the Court in this posture.  *John T. Brady & Co.*, 623 F.2d at 264.  And at any rate, this argument would do nothing to call into question the duration of the 2019 Agreement, which was executed four years after the MOU was adopted.

11

Accordingly, the Court concludes that the IC's interpretation of the 2013 and 2019 Agreements was reasonable, and thus denies White Pearl's cross-motion to vacate the May 2024 Award.

**B.    July 2024 Award**

The Court also denies White Pearl's cross-motion to vacate the July 2024 Award, which re-confirmed that the 2013 and 2019 Agreements remained in force and further concluded that Paragraph 7 the 2019 Agreement prohibited White Pearl from unilaterally implementing technological changes like the PBX system. *See* July 2024 Award at 4. White Pearl's cross-motion argues that the Award contained three "manifest" errors: that the 2013 and 2019 Agreements remained in force, that the 2019 Agreement applied to the PBX dispute and that the 2019 Agreement excused the Union from renegotiating the introduction of the PBX system.

The Court quickly disposes of White Pearl's first argument, which is merely a re-hashing of its challenge to the May 2024 Award. As the Court already explained, the IC had a colorable basis to find that both Agreements implicitly incorporated the 2026 termination date of the IWA, which meant neither was terminable at will.

The Court also rejects the argument that the IC committed manifest error in finding that the 2019 Agreement applied to the PBX dispute. In White Pearl's telling, the 2019 Agreement applied exclusively to the keyless entry dispute that prompted the parties to enter into that Agreement, which would mean that Paragraph 7 did not restrict White Pearl from introducing *other* technological changes in the future, like the PBX system. *See* White Pearl Opp'n at 11. But that reading of the Agreement makes little sense. In Paragraphs 1 through 6, the parties resolve the keyless entry dispute, agreeing to permit the hotel to implement the new system as long as no employees were laid off or required to take on additional work. *See* 2019 Agreement ¶¶ 1–6.

12

Paragraph 7 then purports to limit White Pearl's ability to implement "any changes" under Article 53(D) of the IWA that would "increase workload or otherwise appreciably alter other terms and conditions of employment without the consent of the Union." *Id.* ¶ 7.

The natural reading of this language is that it applies to "*any*" future technological change, not just the keyless entry system. Unlike the earlier paragraphs, Paragraph 7 uses broad and unqualified language—"any changes"—and offers no textual clues that its scope is limited to keyless entry. Moreover, if Paragraph 7 applied *only* to the keyless entry dispute, it would be entirely redundant: Paragraph 4 already permitted White Pearl to implement the keyless entry system as long as it did not "increase workload or otherwise appreciably alter" employee duties, so there would be no need for Paragraph 7 to repeat the same restriction. *Id.* ¶ 4. This only further confirms that Paragraph 7 applies to all new technological changes, including the PBX system, as the IC reasonably concluded. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." (alterations internal quotation marks omitted)).

Nor is the Court persuaded that the IC manifestly erred in ruling that White Pearl could not "compel the Union to renegotiate" in order to implement the desired PBX system. *See* July 2024 Award at 4. According to White Pearl, the IC construed the 2019 Agreement as granting the Union "unlimited and unchecked authority to block any technological improvement without an attendant obligation to engage in good faith bargaining" with White Pearl. White Pearl Opp'n at 11. This expansive construction, White Pearl insists, was manifestly wrong and must be corrected.

Once again, the Court must defer to the IC's construction of the relevant agreements. The IC interpreted the 2013 and 2019 Agreements as "effectively foreclos[ing]" White Pearl from

unilaterally enacting new systems under Article 53 that would "result in the layoffs" of employees. July 2024 Award at 3. That interpretation finds a colorable basis in the text of the 2019 Agreement itself, which provided that "[t]he Hotel may not rely on Article 53(D) of the IWA to implement any changes which would result in any bargaining unit employee being laid off, placed on a reduced work week, or otherwise adversely effected, nor which would result in a reduction in the number of bargaining unit positions without the consent of the Union." 2019 Agreement ¶ 7. This interpretation also aligns with the motivations that animated the 2019 Agreement: that the hotel would be allowed to implement one more technological change (the keyless entry system), and in exchange the Union would receive an expanded right to veto additional changes in the future. *See* July 2024 Award at 3 ("The clear purpose of those side agreements was to effectively foreclose the Employer from enacting a system that would result in the layoffs of the relevant bargaining unit employees."). Even if there were other ways to interpret the meaning and import of Paragraph 7, the IC's construction was a reasonable one, which prevents the Court from disturbing it here. *See Livermore-Johnson v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 65 N.Y.S.3d 308, 310 (3d Dep't 2017) ("If the contract is reasonably susceptible to different conclusions, including the one given by the arbitrator, courts will not disturb the award.").[4]

Accordingly, the Court denies White Pearl's cross-motion to vacate the July 2024 Award, which was based on the IC's reasonable construction of the relevant Agreements.

## II. Motion to Confirm the Arbitral Award

The denial of White Pearl's cross-motion all but decides the rest of this case. "The court must grant the award unless the award is vacated, modified, or corrected." *Mason Tenders Dist.*

---

[4] The Court need not reach the Union's alternative argument about timeliness, which would not change the Court's ruling on the merits of vacatur. *See* Dkt. No. 26 at 21–22.

*Council of Greater N.Y.*, 2021 WL 363972, at *2 (quoting *D.H. Blair & Co.*, 462 F.3d at 110). When there is no basis for vacatur, "confirmation of an arbitration award is a 'summary proceeding,'" since the only duty remaining for the Court is to "make[] what is already a final arbitration award a judgment of the court." *D.H. Blair & Co.*, 462 F.3d at 110 (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)). Here, the Court has already denied White Pearl's cross-motion to vacate the Awards, which means there is nothing left to do but confirm them. *See Sire Spirits, LLC v. Green*, No. 21-cv-7343 (JPC), 2022 WL 2003483, at *13 (S.D.N.Y. June 6, 2022) (summarily confirming award after denying motion to vacate).

## III.    Motion to Dismiss the Complaint

For similar reasons, the Court also grants the Union's motion to dismiss the complaint. "When a court denies a motion to vacate an arbitration award, the court's judgment has [preclusive] effect; the parties cannot relitigate the validity of the award." *Roseton Generating LLC v. Local 320 of the Int'l Bhd. of Elec. Workers*, No. 23-cv-2198 (PMH), 2024 WL 2785053, at *6 (S.D.N.Y. May 29, 2024). Here, White Pearl's complaint attempts to do just that, as it seeks a declaratory judgment that the 2013 and 2019 Agreements are no longer in force, as well as an injunction barring the Union from enforcing them. *See* Compl. ¶¶ 35–43 (seeking declaratory judgment); *id.* ¶¶ 44–53 (seeking preliminary and permanent injunction). But the May 2024 and July 2024 Awards already decided that very issue—whether the Agreements remain in force or are terminable at will—and the Court has already determined that both Awards must be confirmed. White Pearl therefore cannot maintain an action seeking to challenge the Awards, and its suit must be dismissed.

## CONCLUSION

For these reasons, the Union's motion to dismiss the complaint is granted, and its motion

to confirm the Awards is granted. White Pearl's cross-motion to vacate the Awards is denied. The

Clerk of Court is respectfully directed to terminate any pending motions and close this case.

SO ORDERED.

Dated:    September 11, 2025
          New York, New York

 

_____
Ronnie Abrams
United States District Judge

16